Robert A. Magnanini, Esq.
STONE & MAGNANINI, LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel (973) 218-1111
Fax (973) 218-1106

*Attorneys for Plaintiff*
*Beazley Insurance Company, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEAZLEY INSURANCE COMPANY, INC, : | |
| : | |
| Plaintiff, : | Civil Action |
| : | No. _____ |
| : | |
| v. : | |
| : | |
| : | **COMPLAINT &** |
| BROWN & JAMES, P.C. and : | **JURY TRIAL DEMAND** |
| JOSEPH R. SWIFT, : | |
| : | |
| Defendants. : | |
| : | |

Plaintiff Beazley Insurance Company, Inc. ("Beazley" or "Plaintiff"), by and through the undersigned counsel, and for its Complaint against Defendants Brown & James, P.C. and Joseph R. Swift, Esq. (collectively, "Brown & James" or "Defendants"), states as follows:

### INTRODUCTION

1.       This is an action for legal malpractice brought by Beazley against its attorneys, Brown & James, who lost their way by violating the most sacred duty owed to their client: loyalty.

1

2.     This case involves a statutory mechanism – Mo. Rev. Stat. § 537.065 (1959) (the "065 Agreement") – which allows an insured party to collaborate with an injured plaintiff to arrive at an uncontested judgment by which the insured party is relieved of liability in exchange for saddling the insurer with an enforceable judgment.  The statute was originally crafted to protect an insured defendant whose carrier refused to defend them.  However, this event did not occur in this case as Beazley fully defended its insured, even allowed it to pick and change counsel, and offered the policy limits to settle the case.

3.     In 2014, Beazley, a national insurance company, retained the law firm of Brown & James, at the specific request of its insured, Procarent d/b/a Gateway Ambulance Service, LLC ("Gateway"), an ambulance transportation company, to represent and defend Beazley and Gateway against claims in a personal injury action.  The matter, styled *Jean-Robert Nast v. Gateway Ambulance*, was then pending in the Circuit Court of the City of St. Louis.

4.     On Friday, June 5, 2015, Brown & James received notice from the court that a trial was scheduled to be conducted in the case on the following Monday, June 8, 2015 (the "June 8 Trial").  Not aware that a trial was imminent, Brown & James reached out to Plaintiff's counsel to inquire into the matter and learned that Gateway had negotiated a secret 065 Agreement to orchestrate a multi-million dollar judgment against Beazley in order for Gateway to limit its own liability.

5.     Brown & James, who represented both Beazley and Gateway, also agreed on June 5, 2015 to hide this information from Beazley.  Over that weekend before the trial, Brown & James actually conspired with Gateway, its new counsel and the adversary to withhold this information from Beazley in order to disadvantage and prejudice Beazley as much as possible in

defending against a potential outsized multi-million dollar judgment that plaintiff and Gateway were trying to orchestrate against Beazley.

6.   Not until the following Monday morning, June 8, 2015, the day of trial, did Brown & James finally send an email to Beazley at 8:17 in the morning informing Beazley only that a "hearing" – and not a trial – was going to take place that very afternoon; that Brown & James was instructed by Gateway to withdraw as counsel (with no additional explanation given as to why), and that new lawyers hired by Gateway would be appearing in the case that day.

7.   Brown & James understood or should have understood that the plan effectively shut Beazley completely out of any representation or information concerning the case that was going to trial that Monday afternoon.

8.   Brown & James intentionally never divulged that a secret agreement existed, or that plaintiff and Gateway had agreed the ambulance company could limit its own liability in exchange for giving the plaintiff an award that would be many times above the policy limit to pursue against Beazley.

9.   Brown & James understood or should have understood that Beazley would have no ready representation and no preparation at this so-called "trial," and that Brown & James would not appear on Beazley's behalf to tell the Court that the 065 Agreement should not be entered since Beazley had fully defended Gateway and offered its policy limits, twice, to settle the case.

10.   Brown & James understood or should have understood that the so-called "trial" could result in a judgment enforceable against Beazley.

11.     Brown & James's calculated delay and omissions in its report of this matter to Beazley deprived Beazley of any reasonable opportunity to defend against such a scheme or to protect its interests.

12.     On the morning of the day of the trial, when Beazley first learned that Gateway had replaced Brown & James and that a "hearing" was taking place in the afternoon, Beazley scrambled to retain another attorney last minute.  However, because Brown & James gave Beazley no information over the weekend and only limited information the morning of the trial, Beazley had no time to develop a strategy, its motion to intervene in the case was not perfected in time, and subsequently, denied.  The end result was that Gateway, as agreed, laid down and did not raise any defense at the trial, and the Plaintiff walked away with a judgment for $24,915,604  (the "Judgment"), derived at by the Judge cutting Plaintiff's demand in half. Plaintiff's intention was to collect the Judgment from Beazley.

13.     Brown & James's principal, attorney Joseph Swift has admitted he was "mulling it over" whether to tell his client Beazley about this secret agreement, but he never did.  Instead, he withheld the matter and abandoned his client on the day of trial.  Even though the Court did not grant Brown & James's motion to withdraw as counsel until the following day June 9, 2016, on June 8, Brown & James, which was still representing Beazley, did not appear in court or volunteer to help explain the situation to the Judge that Beazley had provided a defense and had twice offered its policy limits and therefore was not properly the subject of the June 8 Trial or to request an adjournment for Beazley.

14.     To add insult to injury, on July 13, 2015, Brown & James submitted a final invoice to Beazley for payment. In its final invoice, Brown & James billed for drafting correspondence on Friday, June 5 informing Beazley about the changes in their representation of

4

Gateway, which was intentionally not sent until Monday, June 8.  Of course, Brown & James never sent any correspondence to Beazley on Friday, June 5, but it had charged Beazley for drafting and holding it.

15.     As to its billing, subsequently, Brown & James tried to justify its entry by claiming that it doesn't "know that it's all that important to the client to know specifically a date any activity was performed."

16.     Brown & James committed a gross dereliction of its duty of loyalty to Beazley.  It conspired with other parties to hide information from Beazley, waited until last minute on the morning of a trial and then gave Beazley only piecemeal information, and later abandoned Beazley altogether, by not attending the trial, while still being trial counsel of record.  Brown & James must be held to account.

17.     For the last two years, Beazley incurred more than $2,700,000 in legal fees defending Nast's efforts to collect the $24,915,604 Judgment. After two years of litigation, Beazley was finally able to settle with Plaintiff for $2,500,000, a fraction of the Judgment.  This is further evidence that with proper representation on June 8, the erroneous Judgment and subsequent litigation could have been avoided.

## PARTIES

18.     Beazley is a national insurance company with its principal place of business located at 1270 Avenue of the Americas, Suite 1200, New York, New York 10020.

19.     Brown & James is a regional law firm with offices in four states: Arkansas, Illinois, Kanas, and Missouri. Its principal office is located in the State of Missouri. The specific office that provided legal representation to Beazley on the matter at issue is located at Bank of America Plaza, 800 Market Street, Suite 1100, St. Louis, MO 63101-2501.

20.     Joseph R. Swift, Esq. is a principal of Brown & James; his office is located at Bank of America Plaza, 800 Market Street, Suite 1100, St. Louis, MO 63101-2501.

## JURISDICTION

21.     This action is within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

22.     The matter in controversy exceeds $75,000 because Beazley paid Brown & James over $16,000 in legal fees which Beazley now seeks to disgorge and Beazley has been forced to expend over $5,200,000 in legal fees and settlement funds to deal with the situation created and exacerbated by Defendants' action and omissions and legal malpractice.  Beazley now seeks to offset that liability.

23.     Additionally, this matter is between citizens of different states.  Beazley is a Connecticut corporation with its principal place of business in New York, New York.  Brown & James is a Missouri professional corporation with its principal place of business in St. Louis, Missouri.  Upon information and belief, Mr. Swift lives and works in Missouri.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) as the location where Plaintiff resides and where a substantial part of the events or omissions giving rise to the claims occurred.  Beazley retained Defendants in New York; regularly received reports and communications from Defendants in New York; received bills for services rendered and paid those bills from its offices in New York; and the effects of Defendants' actions and inactions, including the damages suffered as a result thereof, were felt in New York.

## FACTUAL ALLEGATIONS

<u>The Underlying Lawsuit</u>

25.     In 2006, Jean-Robert Nast ("Nast"), driving drunk, caused a severe accident resulting in the death of another driver and him being rendered a quadriplegic.  For years Mr. Nast required on-going medical care and regular transport to and from his home for medical treatments.

26.     Gateway, an ambulance transport service, was responsible for transporting Mr. Nast to and from medical appointments.

27.     From 2010 to 2011, Gateway purchased a liability insurance policy from Beazley; the policy period ran from October 1, 2010 to October 1, 2011.

28.     On July 1, 2011, Gateway employees allegedly negligently injured Mr. Nast when they were transporting him.

29.     After receiving notice of the accident, Beazley acted to thoroughly evaluate the claim and to protect the interests of Gateway, its insured.  Beazley, in conjunction with Gateway, hired defense counsel, thoroughly investigated the claim, and attempted to come to a reasonable evaluation of Mr. Nast's damages.  Their efforts were hampered by Mr. Nast's counsel's delay; although, after reviewing Mr. Nast's life care plans both before and after the accident involving Gateway, Beazley uncovered that the only additional costs of care to Mr. Nast were $760 per year for additional anti-seizure medication.

30.     On April 24, 2014, Mr. Nast sued Gateway for personal injuries allegedly sustained as a result of the accident; the matter was styled, *Jean-Robert Nast v. Gateway Ambulance*, Case No. 1422-CC00948, and filed in the Circuit Court of St. Louis, Missouri, the Twenty-Second Judicial District (the "Nast Litigation"), asserting multiple claims against

7

Gateway for injuries and his allegedly diminished condition as a result of Gateway employees' negligence; Mr. Nast demanded $46,030,862 in damages.

31.     During the course of the litigation, Beazley formally offered its full policy limits in settlement of the claim against Gateway during a June 2014 mediation, and again by letter dated June 30, 2014. Mr. Nast rejected each offer.

<u>Beazley Retains Brown & James</u>

32.     After the mediation, Beazley's insured Gateway then demanded that it be represented by new counsel Brown & James.   Beazley acquiesced and agreed to continue to defend Gateway while paying the legal fees generated by their new counsel.

33.     On October 10, 2014, Beazley contacted Brown & James Principal Joseph Swift ("Swift") to discuss the Nast Litigation. On or about October 17, 2017, Brown & James agreed to defend and represent Beazley and Gateway in connection with the Nast Litigation. Swift was the Brown & James partner principally responsible for the representation.

34.     On or about January 9, 2015, Brown & James specifically memorialized the retention and representation of Beazley in the Nast Litigation.

35.     In part, this relationship was initially formed and continued as a result of Brown & James holding itself out in its advertising, on the internet and otherwise, as being specialized in the areas of "Insurance Law" and "Health Care Liability."

36.     Additionally, Swift made specific affirmative representations regarding Brown & James's purported expertise in these areas. In an effort to market their legal services, Swift informed Beazley that he had reviewed the docket for the Nast Litigation and that he had litigated similar matters in the past.

37.     Gateway accepted and agreed to the defense and representation provided by Brown & James, with the specific intent and understanding that their services would benefit <u>both</u> Gateway and Beazley, as Gateway's insurer.

38.     In that regard, Beazley required a law firm that could represent both its own interests and Gateway's interests in the Nast Litigation.  Brown & James held themselves out as having such specific experience in Missouri's tripartite relationships, between counsel, the insured and the insurer.

39.     In reliance on Brown & James' representations and advertising efforts, which reached out to the State of New York, both Beazley and Brown & James agreed to form an ongoing, continuing, and direct attorney/client relationship, and as well, a tripartite relationship with the insured Gateway under Missouri law.

40.     That ongoing, continuous and direct attorney/client relationship during that entire time period is evidenced, in part, by correspondence and communications between Brown & James and Beazley addressing attorney/client and work product privilege issues, as well as, attorney invoices submitted to, and paid by, Beazley for legal defense/representation work undertaken by Brown & James on behalf of Beazley and Gateway.

41.     From about October, 2014 through at least June 8, 2015, Brown & James, through Mr. Swift, represented both Beazley <u>and</u> Gateway.

42.     Per New York law, Brown & James owed certain duties in its representation of both its clients, Beazley and Gateway.  This entailed:

a.      <u>Competence</u>: NYRPC 1.1(a) "A lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation;" 1.1(c)

9

"A lawyer shall not intentionally: (1) fail to seek the objectives of the client through reasonably available means permitted by law and these Rules; or (2) prejudice or damage the client during the course of the representation except as permitted or required by these Rules."

b.  <u>Diligence</u>: NYRPC 1.3(a) "A lawyer shall act with reasonable diligence and promptness in representing a client;" 1.3(b) "A lawyer shall not neglect a legal matter entrusted to the lawyer."

c.  <u>Communication</u>: NYRPC 1.4(a) "A lawyer shall…promptly inform the client of: (i) any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(j), is required by these Rules;…and (iii) material developments in the matter."  (b) "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

d.  <u>Conflict of Interest: Current Clients</u>: NYRPC 1.7(a)(1) "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that…the representation will involve the lawyer in representing differing interests."

43.  Per similar Missouri law, Brown & James owed certain duties in its representation of both its clients, Beazley and Gateway.  This entailed:

a.  <u>Competence</u>: M.R.P.C. 4-1.1 "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

b.    <u>Scope of Representation</u>: M.R.P.C. 4-1.2(a) "A lawyer shall abide by a client's decisions concerning the objectives of representation…and shall consult with the client as to the means by which they are to be pursued."

c.    <u>Diligence</u>: M.R.P.C. 4-1.3 "A lawyer shall act with reasonable diligence and promptness in representing a client."

d.    <u>Communication</u>: M.R.P.C. 4-1.4(a)(1) "A lawyer shall keep the client reasonably informed about the status of the matter." (b) "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

e.    <u>Conflict of Interests: Current Clients</u>: M.R.P.C. 4-1.7(a) "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

44.    Per both New York and Missouri law, Brown & James also owed a fiduciary duty in its representation to both its clients, Gateway and Beazley.

45.    From October, 2014, when Brown & James agreed to represent Beazley and Gateway in the Nast Litigation, and through at least until June 9, 2015, when it was relieved as counsel, an ongoing, continuous and direct attorney/client relationship existed between Brown & James, on the one hand, and Beazley and Gateway, on the other hand, in connection with the Nast Litigation.  During the same time period, an insurer/insured/retained counsel tripartite

relationship under Missouri law also existed between Brown & James, on the one hand, and

Beazley and Gateway, on the other hand, which placed Brown & James in a fiduciary

relationship with both Beazley and Gateway

46.     During the pendency of the Nast Litigation, until at least June 8, 2015, Brown &

James regularly reached out to, and communicated with, Beazley in its New York offices

through emails, written correspondence and phone calls.  These efforts were all undertaken by

Brown & James to represent and protect the interests of both Gateway and Beazley in connection

with the Nast Litigation.

The Secret 065 Agreement:
Brown & James Violates Its Fiduciary Duty to Beazley

47.     Despite Beazley's best efforts to reach a settlement with Mr. Nast's counsel, on or

about June 5, 2015, after months of negotiations, Gateway secretly entered into the 065

Agreement with Mr. Nast.

48.     Section 537.065 is a Missouri statute under which a plaintiff may agree not to

execute against the tortfeasor's assets, whereas the tortfeasor, knowing that they will not be held

personally responsible, agrees either to settle or compromise the claim or not to oppose the

plaintiff's prosecution of the claim at trial.  After resolution of the personal injury claim, the

plaintiff can then pursue an equitable garnishment claim against the insurance company only.

49.     The purpose of the Statute was to allow insureds whose insurance carrier had

refused to provide a defense or settle a matter within the policy limits with a method to resolve

an action against them.

50.     Under the terms of their 065 Agreement, Gateway agreed that it would pay Mr.

Nast $100,000 and cooperate with him in obtaining a  judgment against Beazley, and in return

Gateway would escape any further financial liability, which would fall instead entirely on Beazley.

51.     On or about Friday, June 5, 2015, Gateway contacted Mr. Swift of Brown & James to inform him that they were entering into the 065 Agreement with Nast.  Additionally, Gateway instructed Swift that Gateway would no longer be represented by Brown & James and that Brown & James would not represent Gateway at the upcoming June 8, trial on liability and damages.

52.     Despite Beazley having provided a full defense to Gateway and having twice offered the policy limits to resolve the case, Gateway had unilaterally decided to cooperate with Mr. Nast in achieving an outsized award on his personal injury claims in return for his agreement to only seek damages against Beazley, and to relieve Gateway of any further liability under the 065 Agreement.

53.     Moreover, to ensure Beazley would be unable to adequately represent itself, Gateway instructed Swift not to notify Beazley of these events.

54.     Despite the fact that Brown & James still represented Beazley, which had promptly paid their bills incurred in defense of the case, Swift "requested [Gateway's] permission to notify Beazley," of Gateway's actions, i.e. that Beazley would be entirely unrepresented at the June 8 Trial, stating: "Please let me know I may [inform Beazley of these events].  I may have to let them know regardless of your direction. I am still mulling that over." Mr. Swift tacitly acknowledged his duty and violation of such by listening to Gateway's instructions.

55.     In response, Gateway instructed Swift that they do "not object to you telling Beazley simply that there is a hearing at 1:30 on Monday and that you have been instructed to withdraw when business opens Monday."

56.     Brown & James, despite the fact that they still represented Beazley in the Nast Litigation, agreed to withhold this information from Beazley for three days—until the very morning of the June 8 Trial—thereby breaching their fiduciary duty to Beazley and their ethical duties of competence, communication, diligence, and avoiding a conflict of interest.

57.     Just three days before trial, Brown & James, who represented both Beazley and Gateway, agreed to hide this information from Beazley.  Over that weekend before the trial, Brown & James thus conspired with opposing counsel and the adversary to withhold this information from Beazley in order to disadvantage and prejudice Beazley as much as possible in defending against an outsized multi-million dollar judgment that plaintiff and Gateway were trying to orchestrate on Monday at the June 8 Trial against Beazley.

58.     The purpose of the conspiracy was to prejudice Beazley by not having Brown & James appear to tell the Court that Beazley had, in fact, both fully defended Gateway and twice offered the policy limits, and that the 065 Agreement was improper and unwarranted, and by preventing Beazley from securing adequate representation and moving in a timely and orderly fashion to intervene or otherwise block the entry of an outsized award by way of motion, order to show cause, emergent application, or otherwise.

59.     Brown & James knew or should have known that Beazley would be harmed by their decision to withhold the fact that they had been terminated from representing Gateway, that Gateway had entered into the 065 Agreement with Nast, and that Beazley would be directly

14

liable for any outsized judgment obtained by Nast at the June 8 Trial, especially since Beazley had done everything required of it with respect to its insured, Gateway.

60.     Not until Monday morning, June 8, 2015, the day of trial, did Brown & James send an email to Beazley at 8:17 in the morning informing Beazley only that a "hearing" – and not a trial – was going to take place that very afternoon; that Brown & James was instructed by Gateway to withdraw as counsel (with no additional explanation given as to why), and that new lawyers hired by Gateway would be entering the case that day.

61.     Brown & James understood or should have understood that Beazley would have no ready representation at this so-called "trial." Without counsel representing Beazley at the June 8 Trial, Brown & James understood or should have understood that Nast would be able to present his claims unchallenged, and would be able to submit any evidence without objection, since Gateway had agreed to lay down and not raise a defense or cross examine Mr. Nast's witnesses. Brown & James understood or should have understood that the so-called "trial" could result in a judgment enforceable against Beazley.

62.     Brown & James's calculated delay and omissions in its report of this matter to Beazley either prevented the Court for entering judgment at all against Beazley or deprived Beazley of any reasonable opportunity to defend against such a scheme or to protect its interests.

63.     Despite Brown & James's duty to Beazley, Beazley did not learn of Gateway's termination of Brown & James, or the existence of the June 8 Trial, until the morning of June 8, 2015.

64.     Despite Beazley's attempts to find last-minute representation in the few hours following notification of these events and the afternoon trial, Beazley was not adequately represented at the June 8 Trial.

65.     On the morning of the day of the trial, when Beazley first learned that Gateway had replaced Brown & James and that a trial was taking place in the afternoon, Beazley scrambled to retain another attorney last minute.  However, because Brown & James gave Beazley no information over the weekend and only limited information the morning of the trial, Beazley had no time to develop a strategy, its motion to intervene in the case was not perfected in time, and subsequently, denied.  The end result was that Gateway, as agreed, laid down and did not raise any defense at the trial, and Nast walked away with an almost $25,000,000 judgment with the intent of enforcing the same against Beazley.

66.     Despite the fact that Brown & James was still counsel for Beazley and counsel of record in the case, Brown & James did not appear at the June 8 Trial.

67.     Due to Brown & James's malpractice, Nast succeeded in obtaining the Judgment award, and Gateway walked away from any further responsibility by tendering a mere $100,000, despite the fact that Beazley had fully tendered a defense for Gateway and twice offered the policy limits to settle the case.

68.     On June 9, 2017, the Court entered the Judgment against Beazley.  That same day, the Court signed the order granting Defendants' withdrawal from the case.

69.     On July 13, 2015, Brown & James submitted another invoice to Beazley for services rendered for the Nast Litigation. This bill included a time entry for June 5, 2015, where Swift billed 0.2 hours for "Correspondence to…Beazley re: hearing on 6/8/15 at 1:30, instructed to withdraw by Gateway."  However, Brown & James never transmitted any correspondence to Beazley on June 5; Swift did not correspond or notify Beazley until the morning of June 8, 2015.

70.     As of this date, Beazley has spent more than $2,700,000 in legal fees and an additional $2,500,000 to settle with Mr. Nast.

## FIRST CLAIM FOR RELIEF
(Legal Malpractice)

71.     Beazley realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

72.     At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between Plaintiff, on the one hand, and Defendants, on the other hand.

73.     Additionally, during that same time period, an insurer/insured/retained counsel tripartite relationship also existed between Defendants, on the one hand, and Plaintiff and Gateway, on the other hand.

74.     Defendants owed Beazley a duty of due care pursuant to those relationships with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto.  That duty of due care included but was not limited to, exercising the same reasonable degree of care, skill, knowledge, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised.

75.     However, Defendants breached their duties to Beazley and failed to use such skill, knowledge, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto, as evidenced by, *inter alia*, the following acts and omissions by Defendants:

    a.   Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

17

    b.  Failing to disclose the facts and circumstances surrounding the 065 Agreement and Gateway's intent to obtain a "lay down judgment" by preventing Beazley from adequately representing and defending itself in order to obtain an inflated judgment.

    c.  Failing to disclose and actively concealing the fact that Gateway had secretly agreed to execute the 065 Agreement in advance of the June 8 Trial.

    d.  Failing to appear at the June 8 Trial, while it was still counsel of record, to defend Beazley and object to the admission of evidence, seek continuance, or otherwise protect Beazley's interests against an outsized judgment.

76.    Defendants' actions and omissions were negligent and/or constituted breach of the attorney-client relationship between them.

77.    As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: a $24,915,604 million judgment was entered in the Nast Litigation, Beazley has been forced to expend more than $5,200,000 of attorneys' fees, costs, expenses and settlement funds to defend and protect itself against Nast's efforts to collect the Judgment, and Beazley's damages also extend to the amounts it paid Brown & James in connection with the Nast Litigation, as well as the costs and fees associated with this litigation.

78.    It was entirely foreseeable by Brown & James that its negligent conduct and/or breach of the attorney-client contract would result in Legal Malpractice with associated direct and appreciable harm to Beazley, since Nast's and Gateway's strategy, known to Defendants before the June 8 Trial, was to try to hold Beazley liable for any judgment that resulted from the June 8 Trial.  But for the acts and omissions on the part of Defendants, Beazley would not have suffered the above-referenced damages.

79.     The conduct of Defendants was outrageous and dishonest, and was undertaken with reckless indifference to Beazley, justifying the imposition of punitive damages against it.

## SECOND CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

80.     Beazley realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

81.     Based on the attorney/client relationship between Beazley, on the one hand, and Defendants, on the other hand, and pursuant to their direct and tripartite relationship, Defendants owed Beazley fiduciary duties, including but not limited to, the duty of loyalty, the duty of confidentiality, the duty to avoid conflicts of interest, the duty to communicate, and the duty of candor.

82.     Defendants were  under a strict ethical obligation under Missouri and New York law and pursuant to the governing Rules of Professional Conduct not to engage in any the following improper conduct:

   a.   Represent a client when a concurrent conflict of interest exists. "A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to the representation of another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

   b.   Withhold "information to serve the lawyer's own interest or convenience or the interests or convenience of another person."

   c.   Fail to keep "a client reasonably informed about the status of a matter," such as "significant developments affecting the timing or the substance of the representation."

19

d. Fail to "explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation."

e. Fail to "disclose a material fact when disclosure is necessary to avoid assisting a . . . fraudulent act by a client."

83.     Defendants breached their fiduciary duties to Beazley by *inter alia*:

a. Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

b. Failing to disclose the facts and circumstances surrounding the 065 Agreement and Gateway's intent to obtain a "lay down judgment" by preventing Beazley from adequately representing and defending itself in order to allow Nast to obtain an inflated Judgment.

c. Failing to disclose and actively concealing the fact that Gateway had secretly agreed to execute the 065 Agreement in advance of the June 8 Trial.

d. Failing to disclose and actively concealing the scheduling of a trial, not a hearing, on June 8.

e. Failing to appear at the June 8 Trial on behalf of Beazley to tell the Court that Beazley had, in fact, both fully defended Gateway and twice offered the policy limits, and therefore the 065 Agreement was improper and unwarranted in this instance.

84.     As a direct and proximate result of the afore-referenced acts and omissions by the Defendants, the following occurred: a $24,915,604 million judgment was entered in the Nast Litigation; Beazley has been forced to expend more than $2,700,000 of attorneys' fees, costs and

20

expenses to defend and protect itself against Nast's efforts to collect the Judgment and, was forced to pay an additional $2,500,000 to settle the case to protect its other business interests that have been directly affected by the actions of Brown & James and the existence of the Judgment. Beazley's damages also extend to the amounts it paid Brown & James in connection with the Nast Litigation.

85.     It was entirely foreseeable by Defendants that their negligent conduct would result in direct and appreciable harm to Beazley since Beazley was Gateway's insurer and could ultimately be liable for any judgment that resulted from its negligence or its intentional conduct and, in fact, Brown & James participated in Gateway's efforts with the understanding that its actions would result in such harm.

86.     But for the acts and omissions on the part of Defendants, Beazley would not have suffered the above-referenced damages.

87.     The conduct of Defendants was outrageous and dishonest, and was undertaken with reckless indifference to Beazley, justifying the imposition of punitive damages against it.

**THIRD CLAIM FOR RELIEF**
(Negligence)

88.     Beazley realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

89.     At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between Beazley, on the one hand, and Defendants, on the other hand.

90.     Additionally, during that same time period, an insurer/insured/retained counsel tripartite relationship also existed between Defendants, on the one hand, and Beazley and Gateway, on the other hand.

21

91.     Defendants owed Beazley a duty of due care pursuant to those relationships with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto.  That duty included but was not limited to, exercising the same reasonable degree of care, skill, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised.

92.     However, Defendants breached their duties to Beazley and failed to use such skill, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto, as evidenced by, *inter alia*, the following acts and omissions by Defendants:

   a.   Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

   b.   Failing to disclose the facts and circumstances surrounding the 065 Agreement and Gateway's intent to obtain a "lay down judgment" by preventing Beazley from adequately representing and defending itself in order to obtain an inflated judgment.

   c.   Failing to disclose and actively concealing the fact that Gateway had secretly agreed to execute the 065 Agreement in advance of the June 8 Trial.

   d.   Failing to disclose and actively concealing scheduling of a trial, not a hearing, on June 8.

e.  Failing to appear at the June 8 Trial on behalf of Beazley to tell the Court that
Beazley had, in fact, both fully defended Gateway and twice offered the policy
limits, and therefore the 065 Agreement was improper and unwarranted in this
instance.

93.    As a direct and proximate result of the afore-referenced acts and omissions, the
following occurred: a $24,915,604 judgment was entered in the Nast Litigation; Beazley has
been forced to expend more than $2,700,000 of attorneys' fees, costs and expenses to defend and
protect itself against Nast's efforts to collect the Judgment and, was forced to pay an additional
$2,500,000 to settle the case to protect its other business interests that have been directly affected
by the actions of Defendants and the existence of the Judgment.  Beazley's damages also extend
to the amounts it paid Brown & James in connection with the Nast Litigation, and costs and fees
in connection with this litigation.

94.    It was entirely foreseeable by Brown & James that its negligent conduct would
result in direct and appreciable harm to Beazley, since Beazley was directly liable for any
judgment that resulted from its negligence or its intentional conduct.

95.    But for the acts and omissions on the part of the Defendants, Beazley would not
have suffered the above-referenced damages.

96.    The conduct of the Defendants was outrageous and dishonest, and was undertaken
with reckless indifference to Beazley, justifying the imposition of punitive damages against it.

**FOURTH CLAIM FOR RELIEF**
(Unjust Enrichment)

97.    Beazley realleges and incorporates herein by reference each and every foregoing
paragraph of this Complaint as if set forth in full.

98.     At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between Beazley, on the one hand, and Brown & James, on the other hand.

99.     Beazley paid Brown & James more than $16,000 for the handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto.

100.    However, despite receiving approximately $16,000, Brown & James was unjustly enriched by charging Beazley for legal fees and costs, yet failing to properly handle and defend the Nast Litigation.

101.    As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: Beazley spent approximately $16,000 on legal fees for Brown & James' deficient representation, which resulted in a $24,915,604 million judgment was entered in the Nast Litigation; Beazley has been forced to expend more that $2,700,000 of attorneys' fees, costs and expenses to defend and protect itself against Nast's efforts to collect the judgment and, was forced to pay $2,500,000 to settle the case to protect its other business interests that have been directly affected by the actions of Defendants and the existence of the Judgment.

102.    But for the acts and omissions on the part of Brown & James, Beazley would not have suffered the above-referenced damages.

### FIFTH CLAIM FOR RELIEF
(Fraud)

103.    Beazley realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

104.    At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between Beazley, on the one hand, and Defendants, on the other hand.

24

105.     However, Defendants committed fraud against Beazley by deliberately withholding and/or misrepresenting crucial information in an attempt to harm Beazley's interests and ability to represent itself in the Nast Litigation, as evidenced by, *inter alia*, the following acts and omissions by Defendants:

    a.  Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

    b.  Failing to disclose the facts and circumstances surrounding the 065 Agreement and Gateway's intent to obtain a "lay down judgment" by preventing Beazley from adequately representing and defending itself in order to obtain an inflated judgment.

    c.  Failing to disclose and agreeing with Gateway to actively conceal the fact that Gateway had secretly agreed to execute the 065 Agreement in advance of the June 8 Trial.

    d.  Misrepresenting the June 8 Trial as a "hearing," and not a "trial" that could result in a final judgment in the e-mail communication to Beazley on the morning of June 8.

    e.  Failing to appear at the June 8 Trial on behalf of Beazley to tell the Court that Beazley had, in fact, both fully defended Gateway and twice offered the policy limits, and therefore the 065 Agreement was improper and unwarranted in this instance.

    f.  Billing for and seeking payment for work not performed on June 5, 2015.

106.     Defendants' misrepresentations and omissions were material to Beazley's right to make informed decisions about the legal strategy and representation in the Nast Litigation.

107.     Defendants were aware of the falsity of its misrepresentations and omissions to Beazley and knew or should have known that Beazley would rely upon them to its detriment.

108.     Defendants knew or should have known that Beazley was ignorant and not aware of the falsity or omissions in Defendants' misrepresentations.

109.     Beazley had every right to rely on Defendants' representations and justifiably relied on said representations to make decisions concerning the legal strategy and representation in the Nast Litigation.

110.     As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: a $24,915,604 million judgment was entered in the Nast Litigation; Beazley has been forced to expend more than $2,700,000 of attorneys' fees, costs and expenses to defend and protect itself against Nast's efforts to collect the Judgment and, was forced to pay an additional $2,500,000 to settle the case to protect its other business interests that have been directly affected by the actions of Defendants and the existence of the Judgment. Beazley's damages also extend to the approximately $16,000.00 it paid Brown & James in connection with the Nast Litigation.

111.     It was entirely foreseeable by Brown & James that its fraudulent conduct would result in direct and appreciable harm to Beazley, since Beazley was directly liable for any judgment that resulted from its negligence or its intentional conduct.

112.     But for the acts and omissions on the part the Defendants, Beazley would not have suffered the above-referenced damages.

113.    The conduct of Defendants was outrageous and dishonest, and was undertaken with reckless indifference to Beazley, justifying the imposition of punitive damages against it.

## SEVENTH CLAIM FOR RELIEF
(Conspiracy)

114.    Beazley realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

115.    At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between Beazley, on the one hand, and Defendants, on the other hand.

116.    Additionally, during that same time period, an insurer/insured/retained counsel tripartite relationship also existed between Brown & James, on the one hand, and Beazley and Gateway, on the other hand.

117.    Defendants owed Beazley a duty of due loyalty and  care pursuant to those relationships with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto.  That duty included but was not limited to, exercising the same reasonable degree of care, skill, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised.

118.    Defendants conspired with Gateway to breach its duties to Beazley and failed to use such skill, prudence, diligence, loyalty and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised with respect to its handling and defense of the Nast Litigation and its representation of Beazley's interests in relation thereto, as evidenced by, *inter alia*, the following acts and omissions by Defendants:

   a. Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

   b. Failing to disclose the facts and circumstances surrounding the 065 Agreement and Gateway's intent to obtain a "lay down judgment" by preventing Beazley from adequately representing and defending itself in order to obtain an inflated judgment.

   c. Failing to disclose and actively concealing the fact that Gateway had secretly agreed to execute the 065 Agreement in advance of the June 8 Trial.

   d. Misrepresenting the June 8 Trial as a "hearing," and not a "trial" that could result in a final judgment in the e-mail communication to Beazley on the morning of June 8.

   e. Failing to appear at the June 8 Trial on behalf of Beazley to tell the Court that Beazley had, in fact, both fully defended Gateway and twice offered the policy limits, and therefore the 065 Agreement was improper and unwarranted in this instance.

119. On or about Friday, June 5 through Monday, June 8, 2015, Defendants and Gateway intentionally agreed to limit, misrepresent and conceal the aforementioned information from Beazley that was critical to its legal representation and its ability to defend against the entry of an outsized judgment at the June 8 Trial.

120. Defendants and Gateway knew or should have known that their agreement to limit, misrepresent and conceal the aforementioned information from Beazley was unlawful,

improper and a violation of Beazley's right to adequate representation as a member of the tripartite relationship between them.

121.    At Gateway's insistence, Defendants' intentional delay in alerting Beazley of the June 8 Trial and intentional failure to accurately and truthfully disclose all relevant information concerning that proceeding in its June 8 email to Beazley constituted an overt act in furtherance of the conspiracy intended to prejudice Beazley at the June 8 Trial.

122.    As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: a $24,915,604 million judgment was entered in the Nast Litigation; Beazley has been forced to expend more than $2,700,000 of attorneys' fees, costs and expenses to defend and protect itself against Nast's efforts to collect the Judgment and, was forced to pay an additional $2,500,000 to settle the case to protect its other business interests that have been directly affected by the actions of Defendants and the existence of the Judgment. Beazley's damages also extend to the $16,000.00 it paid Brown & James in connection with the Nast Litigation.

123.    It was entirely foreseeable by Brown & James that its conspiracy with Gateway would result in direct and appreciable harm to Beazley, since Beazley was directly liable for any judgment that resulted from its negligence or its intentional conduct.

124.    But for the acts and omissions on the part of Brown & James, Beazley would not have suffered the above-referenced damages.

125.    The conduct of Brown & James was outrageous and dishonest, and was undertaken with reckless indifference to Beazley, justifying the imposition of punitive damages against it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Beazley respectfully requests that this Court enter judgment in its favor and against Defendants Brown & James and Mr. Joseph Swift for Beazley's economic, compensatory, consequential and all other damages as alleged herein and/or based on the evidence at trial, as well as punitive damages, prejudgment interest, attorney's fees, costs, and expenses, and such other and further relief that this Court deems proper under the circumstances.

## DEMAND FOR JURY TRIAL

Beazley hereby demands a jury trial of all issues and claims in this action so triable as of right by a jury.

Respectfully submitted,

Dated: March 13, 2018

**STONE & MAGNANINI LLP**

By:    /s/ Robert A. Magnanini
       Robert A. Magnanini

100 Connell Drive, Suite 2200
Berkeley Heights, New Jersey 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff*
*Beazley Insurance Company, Inc.*